# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

STATE OF NEBRASKA,

                Plaintiff,

       v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; and GINA
McCARTHY, Administrator, U.S. EPA,

              Defendants.

Civil Action No. 4:14-cv-3006

## EPA'S MOTION TO DISMISS

### INTRODUCTION AND SUMMARY

      Plaintiff State of Nebraska challenges a notice of *proposed* rulemaking in this case.  The prematurity of Nebraska's claim, as well as the unique jurisdictional provisions of the Clean Air Act, raise a of host of jurisdictional and other dispositive defects in the Complaint, which the Court should dismiss pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.

      Nebraska asserts a claim under the Administrative Procedure Act ("APA") challenging the lawfulness of the Environmental Protection Agency's ("EPA's) Clean Air Act ("CAA") notice of *proposed* rulemaking regarding "Standards of Performance for Greenhouse Gas Emissions from New Statutory Sources:  Electric Utility Generating Units," 79 Fed. Reg. 1,430 (Jan. 8, 2014) ("Proposed Rule").  Complaint ¶¶ 1, 28.  Nebraska alleges specifically that the Proposed Rule contravenes section 402(i) of the Energy Policy Act (the "Policy Act"), 42 U.S.C.

15962(i), because proposed, critical findings in the Proposed Rule are based on information from facilities that receive federal assistance.  Complaint ¶ 4.  EPA has published a Notice of Data Availability seeking further public comment on this very issue:  the meaning and application of section 402(i) of the Policy Act.  79 Fed. Reg. 10,750 (Feb. 26, 2014) ("Notice of Data Availability").  EPA further solicited comment on analysis indicating that the Proposed Rule can be justified without considering information from any facility receiving federal assistance (i.e. without considering any of the information Nebraska cites in paragraphs 22-26 of its Complaint). *Id.* at 10,752.

An APA claim challenging an agency action only exists to challenge *final* actions.  Thus, Nebraska's attempt to challenge the Proposed Rule must fail.  Because the challenged publication is only a *proposed* rule reflecting proposed interpretations and analysis, by definition it does not represent EPA's final determination with respect to the matters addressed.  EPA is soliciting comment on every issue relating to the Policy Act that forms the basis of Nebraska's complaint.  Indeed, while EPA could ultimately take final action to adopt the proposal as a final rule, it also remains a possibility – until EPA makes a final determination – that EPA could choose *not* to adopt the proposal.  Similarly, based on further analysis or based on additional information submitted in public comments, EPA could reach different conclusions regarding the information on which the Proposed Rule is based.  In any event, EPA will make its final determinations on these matters and will promulgate a final rule, if any, only after consideration of the public comments it receives on the Proposed Rule and Notice of Data Availability.  *See* 42 U.S.C. § 7411(b)(1)(B).  *See also* 79 Fed. Reg. 1430/1 (comments due by March 10, 2014); 79 Fed. Reg. 12,681 (March 6, 2014) (extending public comment period on the Proposed Rule and Notice of Data Availability an additional 60 days until May 9, 2014).

Even if the Proposed Rule were assumed to be a final action, this Court would still lack jurisdiction because section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), places exclusive jurisdiction for review of final actions of national scope under that statute in the D.C. Circuit. The Proposed Rule proposes to set new source performance standards pursuant to section 111 of the Act, 42 U.S.C. § 7411. All challenges to such standards may be brought "only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1). Thus, not only does Nebraska seek court intervention prematurely, an attempt that would undermine the statutorily-prescribed notice-and-comment process, but Nebraska has also filed in the wrong court. This attempt should be rejected, and this case should be dismissed. A party may challenge any final rule that EPA may promulgate, and such a challenge would be determined on the administrative record exclusively by the D.C. Circuit Court of Appeals, as required by Congress.

## STATUTORY AND REGULATORY BACKGROUND

### I.       Standards of Performance under CAA Section 111

The CAA was enacted in 1970 and extensively amended in 1977 and 1990, and provides a comprehensive program for controlling and improving the nation's air quality through a combination of state and federal regulation. Section 111 of the Act, 42 U.S.C. § 7411, establishes mechanisms for controlling emissions of air pollutants from stationary sources. As a preliminary step, EPA must list categories of stationary sources that the Administrator, in his or her judgment, finds "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). Once it has listed a source category, EPA then establishes "standard[s] of performance" that apply to "new sources," which are defined in the statute as "any stationary source, the construction or

3

modification of which is commenced after the publication of regulations (or if earlier, proposed

regulations) prescribing a standard of performance" for the relevant category.  *Id.* § 7411(a)(2).

Standards of performance for new sources are sometimes referred to as "new source performance

standards" or "NSPS."

> The Act defines a "standard of performance" as:
>
> a standard for emissions of air pollutants which reflects the degree of emission
> limitation achievable through the application of the best system of emission
> reduction which (taking into account the cost of achieving such reduction and any
> nonair quality health and environmental impact and energy requirements) the
> Administrator determines has been adequately demonstrated.

*Id.* § 7411(a)(1).

Although the standard is thus determined by ascertaining the best-performing emissions

reduction system that has been adequately demonstrated for the applicable source category, the

standard generally does not mandate the use of one specific technology to reduce air pollutant

emissions.  *See id.* § 7411(b)(5) ("Except as otherwise authorized . . . nothing in this section shall

be construed to require, or to authorize the Administrator to require, any new or modified source

to install and operate any particular technological system of continuous emission reduction to

comply with any [NSPS].").

The Policy Act contains provisions authorizing various grants, loan guarantees, and other

forms of assistance for investment in clean coal technology.  Several provisions in the Policy Act

relate to an EPA determination of the best system of emission reduction adequately demonstrated

under 42 U.S.C. § 7411(a)(1) of the Clean Air Act.  In particular, Policy Act section 402(i),

codified at 42 U.S.C. § 15962(i), limits the use of information from facilities that receive

assistance under the Act in Clean Air Act rulemakings under 42 U.S.C. § 7411: "No technology,

or level of emission reduction, solely by reason of the use of the technology, or the achievement

of the emission reduction, by 1 or more facilities receiving assistance under this Act, shall be considered to be adequately demonstrated for purposes of section 7411 of the [Clean Air Act]."

42 U.S.C. § 7411 prescribes a specific process and timeline for promulgating an NSPS. After proposing an NSPS, "[t]he Administrator shall afford interested persons an opportunity for written comment on such proposed regulations."  42 U.S.C. § 7411(b)(1)(B).  Only then, "[a]fter considering such comments, [the Administrator] shall promulgate, within one year after such publication, such standards with such modifications as [s]he deems appropriate."  *Id.*

## II.      The Clean Air Act's Subject Matter Jurisdiction Provisions

Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), governs judicial review of certain specified EPA actions or "any other final action" taken by EPA under the Act.  *See generally Harrison v. PPG Ind.*, 446 U.S. 578 (1980).  This provision specifies that a petition for review challenging "any standard of performance or requirement under section 7411 of this title" may be filed "only in the United States Court of Appeals for the District of Columbia."  42 U.S.C. § 7607(b)(1).  Petitions for review of final agency action that is "locally or regionally applicable," meanwhile, "may be filed only in the United States Court of Appeals for the appropriate circuit."  *Id.*

## III.     Background Regarding This Rulemaking

On April 13, 2012, EPA first proposed standards of performance for greenhouse gas emissions from new electric utility generating units.  *See* Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources:  Electric Utility Generating Units, 77 Fed. Reg. 22,392 (April 13, 2012) ("2012 Proposed Rule").  After considering more than 2.5 million comments on the 2012 Proposed Rule, EPA determined that revisions to its approach were necessary and, as a result, EPA published a new proposal on January 8, 2014, withdrawing

the previous proposal as a part of that action.  79 Fed. Reg. 1,430/1.  That January 8th

rulemaking proposal is the Proposed Rule challenged in this case.  The purpose of this proposal,

should it ultimately be promulgated as a rule, is to reduce greenhouse gas emissions from new

fossil fuel-fired power plants by limiting emissions of carbon dioxide ("$CO_2$").  79 Fed. Reg.

1,432/3.  Such plants emit more greenhouse gases than any other stationary source category in

the United States – and emit roughly 40 percent of all anthropogenic $CO_2$ emissions in the

United States.  79 Fed. Reg. 1,443/1.

        In an action with similarities to this case, interested parties claimed that the 2012

Proposed Rule constituted final agency action, and attempted to prematurely challenge the

substance of that proposal.  Consistent with the CAA judicial review provision, 42 U.S.C. §

7607(b), this previous challenge was filed in the D.C. Circuit.  *See Las Brisas Energy Center,*

*LLC v. EPA*, Case No. 12-1248 (D.C. Circuit).  The circuit court found that the *Las Brisas*

petitioners were not challenging a final agency action, and summarily dismissed the challenge.

*Las Brisas* Dismissal Order (Attached as Ex. A).

        Following the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, 529

(2007) that greenhouse gases "unambiguous[ly] are an "air pollutant" under the CAA, EPA has

issued a series of interlinked findings and regulations for control of greenhouse gas emissions

from mobile and certain stationary sources.  The D.C. Circuit upheld all of these (final) actions

in *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012) (cert.

granted *sub nom. Util. Air Regulatory Group*, 134 S.Ct. 418 (2013).  The D.C. Circuit sets out a

more detailed discussion on EPA's regulation of greenhouse gases in *Coalition for Responsible*

*Regulation*.  684 F.3d at 114-16.

In 2006, prior to the Supreme Court's holding in *Massachusetts v. EPA* that greenhouse gases meet the Act's definition of "air pollutant," EPA had promulgated revised standards of performance for power plants that did not address greenhouse gas emissions; those standards were challenged in the D.C. Circuit . *See* 79 Fed. Reg. at 1,444 (discussing prior rulemaking and litigation). EPA subsequently obtained a voluntary remand for the purpose of administrative reconsideration in light of the holding in *Massachusetts v. EPA* and, in response to a Presidential Memorandum,[1] set a timetable for issuing the Proposed Rule challenged here. *Id.*

### IV.   Summary of the Proposed Rule and Remaining Steps in the Section 111 Process

In the Proposed Rule, EPA proposes separate standards of performance for fossil fuel-fired electric steam generating units and for natural gas-fired stationary combustion turbines. 79 Fed. Reg. 1432/3. These proposed standards reflect separate determinations of the best system of emission reduction adequately demonstrated for the two categories of units (electric steam generating units and for gas-fired combustion turbines). The 2012 Proposed Rule had previously relied on a single standard. *Id.* The proposed emission limit for the electric steam generating units is based, in part, on the performance of partial carbon capture and storage as the best system of emission reduction. 79 Fed. Reg. 1433/1. EPA based this proposed determination, in turn, on a review of existing projects that implement carbon capture and sequestration technologies, existing projects that implement various components of carbon capture and sequestration, planned carbon capture and sequestration projects, and scientific and engineering studies of carbon capture and sequestration.

EPA modeled the costs and benefits of the Proposed Rule and determined that "few, if any, solid fossil fuel-fired EGUs will be built in the foreseeable future" and that electricity

---

[1] Memorandum of June 25, 2013 – Power Sector Carbon Pollution Standards Executive Order 13,647 – Establishing the White House Council on Native American Affairs, 78 Fed. Reg. 39,535 (July 1, 2013).

generators are expected to primarily choose new technologies, such as natural gas combined cycle.  *Id.*  In short, the dramatic decrease of natural gas prices have resulted in a market where new natural-gas fired plants will likely predominate.  79 Fed. Reg. 1442.  EPA extensively addressed the application of carbon capture and storage both in the Proposed Rule and in supporting documents.  *See, e.g.,* 79 Fed. Reg. 1,442; 79 Fed. Reg. 10,752 (Feb. 26, 2014)**.**  EPA predicts that the Proposed Rule, if finalized, will have no notable compliance costs because the market dictates the construction of natural gas-fired facilities.  79 Fed. Reg. 1496/1.

EPA sought public comments on a wide range of issues, including on issues regarding: (1) the use of particular methods to measure greenhouse gas emissions; (2) subcategorization of certain units; (3) the use of particular technologies, and a host of additional issues.  79 Fed. Reg. 1496-98.  In  addition to the above-noted and other specific requests for comment, EPA requested comments more generally "on all aspects of the proposed rulemaking" and made clear that "[a]ll significant comments received will be considered in the development and selection of the final rule." *Id.* at 1496/2.

Some of the projects discussed in the Proposed Rule, but by no means all of them, received financial assistance under the Policy Act.  In a Notice of Data Availability posted electronically on January 8, 2014, and published in the Federal Register on February  26, 2014, EPA addressed and solicited comment on the potential implications of this financial assistance for the Proposed Rule.  79 Fed. Reg. 10,750.  Specifically, EPA solicited comment on its "preliminary interpretation" that EPA may rely on information from facilities that have received assistance under the Policy Act so long as that information is not the sole basis for a determination that a particular technology is the best system of emission reduction adequately demonstrated.  79 Fed. Reg. 10,752.  In a Technical Support Document accompanying the

Notice of Data Availability (attached as Ex. B), EPA further solicited comment on "whether any pieces of the evidence presented in the 2014 Proposal may not be evaluated due to the limits imposed by the applicable [Policy Act] provisions."  Technical Support Document at 17 (attached as Ex. C).  EPA also generally solicited comment "on its proposed views as to the meaning and significance of relevant provisions of the [Policy Act], including how these provisions may affect the rationale for EPA's proposed determination that partial CCS [carbon capture and sequestration] is the best system of emission reduction adequately demonstrated for fossil fuel-fired utility boilers and [integrated gasification combined cycle] units."  *Id.* at 1.  EPA further requested comment on its analysis indicating that carbon capture and sequestration is adequately demonstrated for coal-fired utility boilers and IGCC units without considering information from any facility which has received federal assistance. *See Id.* at 17 ("the purpose of this TSD and the NODA it accompanies is to solicit comment on whether any pieces of the evidence presented in the 2014 Proposal may not be evaluated due to the limits imposed by the applicable [Policy Act] provisions … and, if so, whether the remaining evidence is sufficient to support a finding that partial [carbon capture and sequestration] is technically feasible").[2]

Pursuant to 42 U.S.C. § 7411(b)(1)(B), "after considering [the] comments" on the Proposed Rule, including comments on the information presented in the Notice of Data Availability, the Administrator "shall promulgate. . . such standards [of performance] with such modifications as [s]he deems appropriate."   As noted above, the statute provides that the final rule shall be promulgated "within one year after . . . publication" of the proposal.  42 U.S.C. § 7411(b)(1)(B).

---

[2] Contrary to the innuendo in Nebraska's complaint, the Proposed Rule discusses many facilities not receiving federal financial assistance operating one or more components of carbon capture and sequestration.  Complaint ¶¶ 20-26.

## STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court conducts a two-part analysis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, the court must accept all the complaint's <u>factual</u> allegations as true. *Id.* at 678. Second, the court must then "determine whether [the factual allegations] plausibly give rise to an entitlement to relief." *Id.* at 679. This "plausibility" analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may challenge the facial sufficiency of a plaintiff's jurisdictional allegations. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 520–21 (8th Cir. 2007) (citing *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir.1990)). In a facial attack, the standard of review is the same standard that applies to motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6). That is, a court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law," and must determine whether the plaintiff has asserted "facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley*, 509 F.3d at 521. The party seeking to invoke federal jurisdiction – here, Nebraska – carries the burden of establishing that subject-matter jurisdiction exists. *See Jones v. U.S.*, 727 F.3d 844, 846 (8th Cir. 2013). "[A]rgumentative inferences favorable to the party asserting jurisdiction should not be drawn," thus on a 12(b)(1) motion the Court need not accept jurisdictional allegations as true. *See At. Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 198 (2d Cir.1992).

**ARGUMENT**

## I.  Section 7607 of the Clean Air Act Precludes an APA Claim Challenging the Proposed Rule.

Nebraska asserts a single claim for relief under the APA.  Complaint ¶¶ 27-30.  It is well-settled, however, that subsection 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1), provides the exclusive means of obtaining judicial review of enumerated final actions by EPA under the CAA, which include "the promulgation or revision of any standard of performance under section 7411."  42 U.S.C. § 7607(d)(1)(C).  *See Harrison v. PPG Indus.*, 446 U.S. 578, 589 (1980); *Mo. v. United States*, 109 F.3d 440, 441 (8th Cir. 1997) (according to 42 U.S.C. § 7607(b)(1) "final actions of the Administrator of the Environmental Protection Agency ('EPA') are to be reviewed exclusively in the courts of appeals").  The APA provides for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and does not apply when another statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1).  Nebraska, in filing an APA claim, ignores 42 U.S.C. § 7607 – the remedy Congress crafted for challenges to CAA final agency actions under section 7411.  Because 42 U.S.C. § 7607(b) provides an adequate remedy for challenges to any final agency action by the Administrator under the CAA, Nebraska has no APA claim.

In *Bowen v. Mass.*, 487 U.S. 879, 904 (1988), the Supreme Court interpreted 5 U.S.C. § 704 as precluding APA review where Congress has otherwise provided a "special and adequate review procedure."  The alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the "same genre."  *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005) (quoting *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990).  For example,

where Congress created jurisdiction in the Tax Court for certain appeals under the Internal

Revenue Code, the Eighth Circuit found that there was not a duplicate cause of action available

under the APA.  *See Robinette v. Comm'r of I.R.S.*, 439 F.3d 455, 460 n.4 (8th Cir. 2006) (citing

*Bowen*).  Moreover, the APA does not apply where another statute precludes review.  5 U.S.C. §

701(a)(1).  CAA section 307(b), which provides jurisdiction to review CAA final agency actions

under section 7411, precludes a duplicate claim under the APA.

The relief offered under 42 U.S.C. § 7607 is effectively identical, and certainly falls

within the "same genre" of relief available under the APA.  Under the APA a court may "hold

unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Similarly, under the judicial review provision of the CAA the Court may reverse certain CAA

actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right," or "without observance of procedure required by law."  42 U.S.C. § 7607(d)(9)(C), (D).

Many courts have held that the APA standard of review applies when reviewing those types of

EPA action under the Clean Air Act to which 42 U.S.C. § 7607(d)(9) does not apply.  *See, e.g.,*

*Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012); *Sierra Club v.*

*EPA*, 671 F.3d 955, 961 (9th Cir. 2012); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d

670, 674 (7th Cir. 2008); *New York Public Interest Research Group, Inc. v. Johnson*, 427 F.3d

172, 179 (2d Cir. 2005).

Both Plaintiff's APA claim and the CAA judicial review provision are founded on

challenges to final agency action.  5 U.S.C. § 704 ("Actions reviewable" include "final agency

action"); 42 U.S.C. § 7607(b)(1) (action "*promulgating* . . . any standard of performance or

requirement under [42 U.S.C. § 7411]," or "any other . . . *final* action taken, by the Administrator

under this chapter" is subject to review by the D.C. Circuit) (emphasis added).  Both provisions

ensure judicial review based on the administrative record.  5 U.S.C. § 706 ("[T]he court shall

review the whole record. . ."); 42 U.S.C. § 7607(d)(7)(A) (establishing the contents of the record

for judicial review).  The remedy available under the CAA will certainly be adequate to provide

Nebraska a forum to advance its concerns, and the relief available is of the "same genre."

Allowing Nebraska to assert a duplicative claim under the APA would be inconsistent with

Congressional intent, and inconsistent with precedent.

      The Supreme Court has instructed that the APA must be given "a hospitable

interpretation" in situations where a more restrictive reading would deny potential litigants an

opportunity for judicial review.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967), *overruled

on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).  Section 704 of title 5, however, is

not intended to provide additional judicial remedies "where the Congress has provided special

and adequate review procedures."  *Bowen*, 487 U.S. at 903.  The Eighth Circuit has addressed

this question most directly in *Defenders of Wildlife v. EPA*, 882 F.2d 1294 (8th Cir. 1989)

("*Defenders*").  In *Defenders,* environmental groups sued EPA seeking to prevent above-ground

use of a pesticide, alleging that EPA had violated the Endangered Species Act ("ESA"), the Bald

Eagle Protection Act, and the Migratory Bird Treaty Act.  *Id.* at 1296, 1298.  The ESA created a

private right of action that the environmental groups asserted as the basis of their ESA claim, and

the environmental groups also asserted separate APA claims.  *Id.* at 1298.  The district court

reached the merits of the environmental groups' claims, including their APA claims.  *Id.*

      The Eighth Circuit in *Defenders* recognized that "[w]hen Congress has established a

special statutory review procedure for administrative actions, we generally treat that procedure as

the exclusive means of review." *Defenders*, 882 F.2d at 1299. The court went on to state that it was reluctant to permit APA challenges to final agency action where judicial review was otherwise available, and thus concluded that APA review was precluded because another statute (the Federal Insecticide, Fungicide, and Rodenticide Act) provided a framework for obtaining judicial review, and the district court therefore lacked jurisdiction over APA claims. *Id.* at 1302. The district court decision, to the extent that it recognized APA claims, was reversed. *Id.* at 1303.

This case is similar. The CAA provides for judicial review, thus this Court lacks jurisdiction over Nebraska's APA claim. The Proposed Rule follows from a very explicit Congressional grant of authority to EPA. EPA is authorized to establish standards of performance for new stationary sources, and authority to promulgate such standards is created in section 111(a) of the Act, 42 U.S.C. § 7411(a). Such standards are expressly brought within the scope of a "rulemaking" governed by the CAA's judicial review provision. 42 U.S.C. § 7607(d)(1)(C). The statutory authority for the Proposed Rule is provided by sections 111, 301, 302, and 307(d)(1)(C) of the CAA, 42 U.S.C. § 7411, 7601, 7602, 7607(d)(1)(C). 79 Fed. Reg. 1502/2 (Jan. 8, 2014). The Proposed Rule is very clearly an action taken by the Administrator under the CAA, with appropriate authority. Nebraska challenges that CAA action and, as in the *Defenders* case, the statute at issue provides a framework for obtaining judicial review. 42 U.S.C. § 7607. Accordingly, the CAA precludes the APA claim in this case, this Court lacks jurisdiction over Nebraska's APA claim, and that claim must be dismissed.[3]

---

[3] Moreover, as explained in section II. (B) below, if (against our view) EPA has taken any final action here, these same Clean Air Act provisions mandate that the Court of Appeals for the District of Columbia Circuit be the exclusive forum for judicial review.

## II.    Nebraska Has No APA Claim Because the State Fails to Challenge a "Final Agency Action."

Judicial review of agency action under the APA is limited to "final agency action."  5 U.S.C. § 704.  Because the Proposed Rule is not final agency action, Nebraska has not stated a claim under the APA.  The Proposed Rule *cannot* be a final agency action for the evident reason that it is a rulemaking proposal.  *See* 79 Fed. Reg. 1496 (requesting comments that "will be considered in the development and selection of the final rule"); *Las Brisas* Dismissal Order, (D.C. Cir., Dec. 13, 2012)  (Ex. A) (dismissing previous challenge to 2012 Proposed Rule because the agency action being challenged was not final).

### A.    The Proposed Rule does not constitute "other final agency action."

Whether the Proposed Rule is "final agency action" subject to review is governed by the familiar two-part test described in *Bennett v. Spear*, 520 U.S. 154 (1997):  "First, the action must mark the consummation of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 177-78 (internal quotations and citations omitted); *Am. Petroleum Inst. ("API") v. EPA*, 684 F.3d 1342, 1353-54 (D.C. Cir. 2012) (applying *Bennett* to interpretive preamble statement); *National Envt'l Development Ass'n's Clean Air Project ("NEDA-CAP") v. EPA*, 686 F.3d 803, 808-09 (D.C. Cir. 2012) (same).

Here, Nebraska cannot demonstrate that the first *Bennett* criterion is met, because the Proposed Rule clearly does not represent "the consummation of [the Administrator's] decision-making process."  Unlike the *Whitman, API* and *NEDA-CAP* cases cited above, where courts had to examine the underlying regulatory context to ascertain whether preamble statements should be understood to represent EPA's "final word" on NAAQS implementation issues, here the answer

15

to the finality question is a simple one – the process by which the Administrator promulgates standards of performance for new sources is prescribed by 42 U.S.C. §§ 7411(b) and 7607(d), and EPA indisputably has not completed that process.

Nebraska's claim that the Proposed Rule contravenes section 402(i) of the Policy Act changes nothing in this analysis.  Not only did EPA solicit comment on critical issues, but the meaning and applicability of section 402(i) is the express subject of EPA's February 26 Notice of Data Availability soliciting comment on all pertinent issues: the interpretation of section 402(i) of the Policy Act, its applicability, and EPA's analysis indicating that carbon capture and sequestration is adequately demonstrated for coal-fired utility boilers and IGCC units without considering information from any facility which has received federal assistance. *See* 79 Fed. Reg. 10752; TSD at 17 ("the purpose of this [Technical Support Document] and the [Notice of Data Availability] it accompanies is to solicit comment on whether any pieces of the evidence presented in the 2014 Proposal may not be evaluated due to the limits imposed by the applicable Policy Act provisions … and, if so, whether the remaining evidence is sufficient to support a finding that partial [carbon capture and sequestration] is technically feasible"); see also id. at 25 ("[w]e solicit comment on what evidence suffices to demonstrate technical feasibility of $CO_2$ capture technology").  Plainly, EPA is still considering, reviewing, and awaiting public comment on all of the salient issues relating to meaning and applicability of the Policy Act section 402(i). The Proposed Rule consequently cannot be viewed as taking final action with respect to those issues.[4]

---

[4] We note, however, that Nebraska's assertion in complaint paragraph 19 that "[t]he Proposed Rule does not attempt to resolve the inconsistency with the [Policy] Act's prohibition" is mistaken.  Although EPA has taken no final action respecting the meaning and interpretation of the Policy Act, EPA has addressed the Policy Act provisions and how the Proposed Rule appears consistent with them.

Though the Proposed Rule was published in the Federal Register, it is clear that this

publication is undertaken as part of the development of a final rulemaking, consistent with the

CAA rulemaking requirements set out in 42 U.S.C. § 7607(d).  79 Fed. Reg. 1431/2; 1502/2.

EPA solicited public comments that will be considered before any final rule is developed.  79

Fed. Reg. 1496/2.  In the Notice of Data Availability, EPA further solicited comment on

particular issues and information presented by the Proposed Rule, and again indicated that it will

consider all comments in determining whether to issue a final rule and the content of any such

rule.  79 Fed. Reg. 10,752.  The history of this rulemaking record demonstrates that

consideration and response to comments can result in significant and substantive changes, as

demonstrated by the fact that EPA withdrew the 2012 Proposed Rule, and the Proposed Rule

itself is a reaction to comments to that prior rulemaking proposal.  *See* 79 Fed. Reg. 1430/1 ("On

April 13, 2012, the EPA proposed a new source performance standard . . . The EPA received

more than 2.5 million comments on the proposed rule.  After consideration of information

provided in those comments, as well as consideration of continuing changes in the electricity

sector, the EPA determined that revisions in its proposed approach are warranted.").  In sum, the

Proposed Rule does not have binding effects on EPA or on private parties, and there is no

indication that EPA intended the Proposed Rule to have such effects.[5]

The Proposed Rule and proposed interpretations therein are "interlocutory," *Bennett*, 520

U.S. at 178, because the Clean Air Act directs that it "shall" be followed within one year by a

"promulgated" rule issued after consideration of public comments. 42 U.S.C. § 7411(b)(1)(B).  It

is also "tentative," in that EPA has sought comments on all aspects of the Proposed Rule –

_____

[5] In *Iowa League of Cities v. EPA*, 711 F.3d 844, 863 n.12 (8th Cir. 2013), the Eighth Circuit concluded that section 509(b)(1)(E) of the Clean Water Act, 33 U.S.C. § 1369(b)(1)(E), allows review of certain EPA actions regardless of the APA's "finality" requirement.  Here, however, Plaintiffs themselves invoke the APA and thus cannot contend that "finality" is irrelevant.  Thus, *Iowa League of Cities* is inapplicable.

including on the question of the meaning and applicability of the Policy Act that go to the heart of Nebraska's challenges – *and EPA may modify its final action (if any) in any number of ways in response to those comments.  See* 42 U.S.C. § 7411(b)(1)(B) (referring to "promulgation" of standards "with such modifications as [the Administrator] deems appropriate" following consideration of comments on the proposed rule); *supra* at 8-9 (listing examples of issues on which EPA has requested comment); 79 Fed. Reg. at 1496-98 (additional issues).  Indeed, hypothetically it would be well within EPA's administrative discretion to issue a supplemental proposal, issue a modification to the Proposed Rule, or withdraw the Proposed Rule entirely, if the Administrator determined, after consideration of the comments, that such action was appropriate.  *Cf., e.g., Center for Auto Safety v. National Highway Traffic Safety Admin.*, 710 F.2d 842, 846-47 (D.C. Cir. 1983) (evaluating whether agency's decision to terminate a rulemaking was ripe for review).  Thus, the Proposed Rule *cannot* be regarded as – and EPA expressly did not intend the Proposed Rule (including the Notice of Data Availability) to constitute – the Administrator's "final" decision.

The second *Bennett* criterion also is not satisfied here, because the Proposed Rule does not "determine" rights or obligations or impose binding legal consequences.  The *statute* – not the Proposed Rule  – originally established the requirement that "[t]he term 'new source' means any stationary source, the construction or modification of which is commenced after the publication of regulations (or if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source."  42 U.S.C. § 7411(a)(2).  Thus, *under the statute*, whenever EPA publishes proposed standards of performance for new sources in a source category, stationary sources in the category that commence construction after the publication date of the proposal *potentially* become subject to

the proposed standards.  However, it is only the "promulgation" of standards (as proposed, or

with revisions) that imposes a binding legal consequence on owners or operators of new sources,

as Section 111(e) of the Clean Air Act makes clear:  "After the effective date of standards of

performance *promulgated* under this section, it shall be unlawful for any owner or operator of

any new source to operate such source in violation of any standard of performance applicable to

such source."  *Id.* § 7411(e) (emphasis added).  In short, until EPA makes a final decision *and*

*promulgates* standards of performance, it has not created or imposed any new binding legal

consequences or "determined" any new rights or obligations.  As of today, there is no standard of

performance for greenhouse gas emissions applicable to and enforceable against "new" power

plants.  Rather, there is only a proposal.

      As noted above, in *Las Brisas* the Court of Appeals for the D.C. Circuit addressed the

question of whether a proposed rule under the Clean Air Act is a "final action," and determined it

was not.  *Las Brisas* Dismissal Order (D.C. Cir., Dec. 13, 2012)  (Ex. A).  The Eighth Circuit

likewise held that a district court had erred in treating as "final" a proposal by the Attorney

General to remove a drug from the federal list of "controlled substances" in accordance with a

recommendation by the Secretary of Health and Human Services.  *United States v. Springer*, 354

F.3d 772, 776 (8th Cir. 2004).  As the court of appeals explained:

> A major purpose of formal rulemaking is to ensure that agencies gather as much
> relevant information as possible before promulgating final rules that will have the
> force and effect of law.  For this reason, an agency that exercises its discretion to
> propose a rule has no duty to promulgate its proposal as a final rule.  Thus, it is
> well-settled that proposed regulations . . . have no legal effect.

*Id.* at 776 (internal quotation and citations omitted).  The Eighth Circuit's reasoning is equally

applicable  here, since the above-cited provisions of the Clean Air Act expressly require that the

Administrator make the Proposed Rule available for comment and that she "promulgate" the

final rule only after consideration of those comments and responding to the significant comments.

Similarly, in other contexts courts have held that proposed rules have no binding legal effect and are not "final actions" subject to judicial review.  For example, in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), the Supreme Court rejected an argument that an agency's statutory interpretation expressed in a proposed rule should be deemed a "change" in the agency's historic position on the scope of its authority under the relevant statute (and, thus, should be treated as evidence that the agency had not been consistent in interpreting the statute and merited less deference).  *Id.* at 844-45.  The Court found this reasoning to be in error because "[i]t goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."  *Id.* at 845.

The D.C. Circuit addresses challenges to national rulemakings more often than other courts, and has held that preamble statements that "appear[ed] for the first time in a proposed rulemaking" were not subject to judicial review under the Resource Conservation and Recovery Act, 42 U.S.C. § 6976(a).  *Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1418 (D.C. Cir. 1998).  The Court noted that, "[o]n its face, the action at issue is merely a *proposed*, not a final rulemaking."  *Id.* at 1418 (emphasis in original).  Indeed, "the fact that [EPA] has yet to promulgate final rules on many of the issues addressed in the . . . Proposed Rule" was viewed as clear evidence "that EPA is still in the process of clarifying" its position on the issues in dispute, and that the preamble statements therefore were not final for purposes of judicial review.  *Id.* at 1418-19; *see also Center for Law & Educ. v. United States Dep't of Educ.*, 209 F. Supp. 2d 102, 111 (D.D.C. 2002), aff'd, 396 F.3d 1152 (D.C. Cir. 2005) (dismissing complaint that sought

20

review of agency's determination regarding who would sit on a negotiated rulemaking committee; court noted that "proposed rules have only recently been published," and "[i]t is the final rule which will mark the consummation of the agency's decisonmaking process and set forth the agency's definitive position") (internal quotations omitted); *Carlton v. Babbitt*, 147 F. Supp. 2d 4, 5-8 (D.D.C. 2001) (proposal to change classification of grizzly bear populations under the Endangered Species Act is not a reviewable final agency action unless and until the agency "promulgate[s] a final rule combining [the bear populations]").  In this case, EPA categorically indicated that its interpretation of sections of the Policy Act of relevance to this rulemaking were "preliminary" and solicited comment thereon.  79 Fed. Reg. 10,752; TSD p. 1. Such preliminary interpretations are not "final agency action."

For all the above reasons, and consistent with the cited case law, the Court should hold that the Proposed Rule is not reviewable under the APA and dismiss Nebraska's claim.

**B.      Even if the Proposed Rule were Final Agency Action, This Court Would Lack Jurisdiction.**

Nebraska, in its Complaint, "challenges the Proposed Rule as a violation of the Energy Policy Act of 2005."  Complaint ¶ 2.  Thus, Nebraska clearly asserts that the Proposed Rule, an action taken by the Administrator under her authority under the CAA, is the final agency action that forms the basis for its claim.  The judicial review provision of the CAA provides that challenges to an action "*promulgating* . . . any standard of performance or requirement under [42 U.S.C. § 7411]," or "any other nationally applicable regulations promulgated, or *final* action taken, by the Administrator under this chapter," may be brought only in the D.C. Circuit.  42 U.S.C. § 7607(b)(1) (emphasis added).  As noted earlier, the CAA phrase "final action" bears the same meaning in 42 U.S.C. § 7607(b)(1) that it does under the APA.  *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001).  To the extent that the Proposed Rule is considered a

final agency action, any challenge to it must be brought in the D.C. Circuit pursuant to the judicial review provision established by Congress.  42 U.S.C. § 7607(b)(1).  *See* 79 Fed. Reg. 1502/2 (recognizing that the CAA judicial review provisions apply).

Plaintiffs cannot avoid the CAA jurisdictional provision by relying on the APA.  Thus, even if the Court were to assume, for purposes of argument, that Nebraska had properly asserted a cognizable claim under 42 U.S.C. § 7607, and had challenged a final agency action, 42 U.S.C. § 7607(b)(1) provides that challenges to "any standard of performance or requirement under section 7411 of this title may be filed "only in the United States Court of Appeals for the District of Columbia."  Section 307(b)(1) of the CAA is unambiguous: Nebraska may seek review only in the D.C. Circuit.  The vesting of exclusive review of such actions in the D.C. Circuit is designed "to ensure uniformity in decisions concerning issues of more than purely local or regional impact."  *Natural Res. Def. Council, Inc. v. EPA*, 512 F.2d 1351, 1357 (D.C. Cir. 1975). Moreover, the proper application of section 307(b)(1) in this case is straightforward, since, as noted above, the text of 307(b)(1) expressly refers to "any standard of performance or requirement" taken under section 7411.  42 U.S.C. § 7607(b)(1).  Consequently, if the Court believes that the Proposed Rule is either the promulgation of a regulation under the CAA or is final agency action, the Court must dismiss this case or transfer it to the D.C. Circuit.

Where a court finds that it lacks jurisdiction, it may, in the interest of justice, transfer such action any court "in which the action or appeal could have been brought at the time it was filed or noticed."  28 U.S.C. § 1631.  The decision regarding whether to dismiss an action brought in an improper venue or transfer it rests within the court's sound discretion.  *Crenshaw v. Antokol*, 287 F. Supp. 2d 37, 42-43 (D.D.C. 2003).  For the reasons discussed above, the Court should dismiss Nebraska's claim, or transfer it to the D.C. Circuit Court of Appeals.

III.    **Alternatively, Nebraska's Claim Should Be Dismissed As Unripe.**

Because the Proposed Rule is improperly challenged under the APA, and because the

Proposed Rule is not a "final action," the Court need not consider the secondary question of

whether it is ripe for review.  However, even if the Court finds the Proposed Rule otherwise

reviewable, lack of ripeness is an additional reason Nebraska's claim should be dismissed.  The

ripeness doctrine is intended "to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements."  *Pub. Water Supply Dist.*

*No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 572 (8th Cir. 2003) (quoting

*Abbot Labs v. Gardner*, 387 U.S. 136, 148 (1967)).  To determine ripeness, courts consider the

fitness of the issue for judicial decision – encompassing factors such as whether the issue is

purely legal, whether consideration of the issue would benefit from a more concrete setting, and

whether the agency's action is sufficiently final – as well as the hardship to the parties of

postponing review.  *Abbott Labs.*, 387 U.S. at 149-52.  Here, Nebraska cannot satisfy the

"fitness" test for the same reasons discussed above.  *See, e.g., Utility Air Regulatory Group v.*

*EPA*, 320 F.3d 272, 278-79 (D.C. Cir. 2003) (review of guidance document interpreting

regulatory provisions was premature since EPA was undertaking a rulemaking to amend those

provisions); *Center for Auto Safety*, 710 F.2d at 848-49 (preliminary decision not to amend fuel

efficiency standard was not ripe, as the standard would not take effect for several years and the

agency could still reconsider it); *cf. Natural Res. Def. Council v. EPA*, 824 F.2d 1146, 1150

(D.C. Cir. 1987).

**CONCLUSION**

For the foregoing reasons, the Court should grant EPA's Motion and dismiss Nebraska's

Complaint for lack of subject matter jurisdiction, or failure to state a claim upon which relief can

23

be granted.  In the alternative, the Court may transfer this case the D.C. Circuit if it finds that the

interests of justice so require.


                                        Respectfully submitted,

                                        ROBERT G. DREHER
                                        Acting Assistant Attorney General
                                        Environment and Natural Resources
                                          Division

Date: March 18, 2014                    */s/  Jessica O'Donnell*
                                        JESSICA O'DONNELL
                                        MATTHEW R. OAKES
                                        Environmental Defense Section
                                        P.O. Box 7611
                                        Washington, DC 20044
                                        (202) 514-2686 (Oakes)
                                        Matthew.Oakes@usdoj.gov


OF COUNSEL:

STEVEN SILVERMAN
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

## **CERTIFICATE OF SERVICE**

I certify that on March 18, 2014, I caused a copy of the foregoing document to be filed through the Court's electronic filing system and thereby served on counsel through that system.

*/s/ Jessica O'Donnell*